IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EXAVIER L. WARDLAW** | : | **CIVIL ACTION** |
| | : | |
| v. | : | NO. 21-1942 |
| | : | |
| **THE CITY OF PHILADELPHIA,** *et al.* | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                                                     **April 28, 2022**

      Self-proclaimed author, playwright, and community activist Exavier L. Wardlaw repeatedly files claims which we summarily dismiss. We earlier dismissed cases against the City claiming a constitutional right to water service and another against his local supermarket.[1] We dismissed his most recent challenge to a public access station deciding to not broadcast one of his films but granted him leave to amend six weeks ago if he could plead a state actor depriving him of civil rights within our limited federal subject matter jurisdiction.[2] He returns pro se with an amended claim the City of Philadelphia and public access station PhillyCAM and its Board of Directors deprived him of his First Amendment rights by refusing to broadcast one of his films; he asks us to decide what the public access station can broadcast. He does not plead state action. He does not state a claim. He also asks we disqualify ourselves because he thinks we are biased against him. The City and PhillyCAM and its Board separately move to dismiss the amended Complaint. Mr. Wardlaw's amended Complaint fails to state a claim under the First Amendment and we will dismiss it with prejudice.

**I.**     **Alleged pro se facts.**

      Exavier L. Wardlaw describes himself as an author, playwright, and community activist.[3] He planned on filming a musical in 1983 and contacted Comcast for editing assistance.[4] A Comcast manager agreed to help Mr. Wardlaw thirty-nine years ago. While Mr. Wardlaw edited his film,

the manager told Mr. Wardlaw Comcast and Philadelphia City Council had plans to meet about a Philadelphia cable franchise.[5] The Comcast manager asked Mr. Wardlaw to "rally the community" to support Comcast. Mr. Wardlaw agreed to do so and he believes PhillyCAM is based on his vision of public access television.[6]

Mr. Wardlaw sought to air his films and programs on PhillyCAM beginning in December 2020.[7] PhillyCAM denied his request to air his programs. PhillyCAM refused to broadcast the film "Only the Ball was White," a history of the "Black baseball leagues through Jackie Robinson."[8] PhillyCAM refused to broadcast the film, explaining to Mr. Wardlaw the Public Broadcasting Service ("PBS") in Chicago produced the film in 1973 and PhillyCAM could not broadcast the film without violating copyright laws.[9] Mr. Wardlaw disagreed with this explanation because he told someone at PhillyCAM of "leeches" by PBS Chicago in 2020.[10] In another instance, PhillyCAM denied him the right to air an educational program.[11]

He now alleges PhillyCAM denied his First Amendment rights by refusing to broadcast his "Only the Ball was White" film. He claims PhillyCAM and its Board:

- "do not have standing to be the copyright police";[12]

- cannot "contrive a copyright law as an excuse to keep a member from airing a program on public access TV";[13]

- are in breach of "the original contract" between the City and a cable carrier for the Philadelphia cable television franchise;[14]

- do not have the right to deny him, a "member" of PhillyCAM, the right to the "public airways";[15]

- are preventing citizens' access to the public airways for arbitrary reasons "such as enforcing the copyright law" because this is "not the mission of PhillyCAM";[16] and

- are denying him the right to freedom of speech and press by refusing to air his programs on public access television in violation of the First Amendment.[17]

Mr. Wardlaw seeks a "Government decision in this matter so that there is no further confusion as to what can and what cannot be aired on public access TV."[18] He continues to claim the City, PhillyCAM and its Board deprived him of First Amendment rights. He asks for a "change of venue," suggesting we are "biased for PhillyCAM et al."[19]

Mr. Wardlaw submitted two amendments we construe together as his amended complaint.[20] He continues to claim a deprivation by the City and PhillyCAM and its Board of his First Amendment rights. He appears to have abandoned his claim PhillyCAM's discriminated against him on the basis of his race and politics under an unspecified section of the City Rights Act of 1964.[21]

The City and PhillyCAM and its Board move to dismiss the amended Complaint under Federal Rule of Civil Procedure 12(b)(6).[22] Mr. Wardlaw did not respond to the motions to dismiss.[23] We grant the motions to dismiss and dismiss the amended Complaint with prejudice.

## II.     Analysis

Mr. Wardlaw's prolix amended Complaint provides, among other immaterial facts, his background as an author, filmmaker, and playwright beginning in 1973. We construe his amended Complaint as a renewed attempt to bring a claim under section 1983 for the deprivation of his First Amendment right. As we earlier explained, Congress does not confer rights upon Mr. Wardlaw through section 1983. Section 1983 is the vehicle used to bring federal constitutional claims in federal court. Mr. Wardlaw must plead two elements to proceed on civil rights claims: (1) a person acting under color of state law committed the complained-of conduct; and (2) the conduct deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States.[24]

Mr. Wardlaw makes some new allegations, primarily surrounding his belief PhillyCAM and its Board are the "copyright police" and uses the copyright laws as a way to restrain his First

Amendment rights. He also suggests PhillyCAM breached a 1985 contract between the City and a cable contractor. He asks us for a "Government decision in this matter" to clear up confusion "as to what can and what cannot be aired on public access" television. Mr. Wardlaw fails to correct the fatal defects in his original complaint. We grant Defendants' motions to dismiss.[25]

### A. There is no alleged conduct attributable to the City of Philadelphia.

The City seeks dismissal because Mr. Wardlaw fails to allege the City's involvement in the complained-of conduct.[26] Mr. Wardlaw does not cure the defects in his Complaint; his amended Complaint lacks facts regarding the City's involvement in the alleged deprivation of First Amendment rights.

Mr. Wardlaw attaches franchise agreements from September and October 1985 between the City, as franchisor, and Comcast Cablevision of Philadelphia, L.P.; Rollins Cablevision of Philadelphia, Inc.; and Greater Philadelphia Cablevision, Inc., each as franchisees for certain "Franchise Areas."[27] He attaches an amendment to a franchise agreement between the City and Rollins Cablevision in 1986 and 1987 for a "CATV"[28] franchise and an assumption of the Rollins Cablevision franchise by Comcast Cablevision in 1987.[29] He attaches one page of a September 6, 1984 letter from Barbara W. Mather, then City Solicitor, to Representative Thomas M. Foglietta regarding the Cable Communications Act of 1984.[30] These documents do not allege facts supporting the City's involvement in depriving Mr. Wardlaw of any rights. The documents show the City's franchise agreements with cable providers for CATV in the mid-1980s.

We allowed Mr. Wardlaw leave to amend his complaint to allege facts supporting his claim the City deprived him of his First Amendment rights. He failed to do so. We dismiss his amended Complaint against the City with prejudice.

### B. Mr. Wardlaw does not plead PhillyCAM and its Board are state actors.

Mr. Wardlaw repackages his allegations against PhillyCAM and its Board arguing they used the copyright laws as a way to deny him the right to air the film "Only the Ball was White" in violation of the First Amendment. He also alleges PhillyCAM breached franchise agreements between the City and cable providers.

In whatever way he characterizes PhillyCAM's motivation or reasoning for failing to air his films, the Supreme Court's decision in *Halleck* controls and PhillyCAM is not a state actor as a matter of law. State action is a required element to plausibly plead a section 1983 claim. We analyzed *Halleck* and cases from this District applying it and explained Mr. Wardlaw did not allege facts suggesting PhillyCAM performs a traditional, exclusive public function required to find a private entity takes the form of a state actor for purposes of a section 1983 claim.[31] Mr. Wardlaw still does not allege the City compelled PhillyCAM to take a particular action or the City acted jointly with PhillyCAM or facts to plausibly infer PhillyCAM and its Board are state actors. We explained this in our March 10, 2022 Memorandum and gave Mr. Wardlaw leave to amend his complaint if he could do so consistent with Federal Rule of Civil Procedure 11.[32] His amended Complaint is deficient for all the reasons addressed in our earlier memorandum.[33]

### C. We deny Mr. Wardlaw's request for reassignment to another judge of this District.

Mr. Wardlaw seeks a "change of venue because the present Court is biased for PhillyCAM et al."[34] We view his request as asking we disqualify ourselves under Congress's direction in 28 U.S.C. § 455(a) requiring "any … judge … of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[35]

Reassignment under section 455(a) is "an exceptional remedy" and "generally must involve apparent bias deriving from an extrajudicial source, meaning something above and beyond

judicial rulings or opinions formed in presiding over the case."[36] Mr. Wardlaw alleges no such extrajudicial bias. He appears to be unhappy with our decisions. But "adverse rulings–even if erroneous—are not in themselves proof of prejudice or bias" and our Court of Appeals "ha[s] repeatedly stated that a party's displeasure with legal rulings does not form an adequate basis for recusal …."[37] We deny his motion for reassignment.

### III. Conclusion

We dismissed Mr. Wardlaw's original claims challenging the decision to not broadcast his film without prejudice six weeks ago but granted him leave to see if he could cure the deficiencies in his pleading. He needed to support allegations involving the City's conduct in the alleged deprivation of his First Amendment rights and allegations supporting a claim PhillyCAM and its Board of Directors are state actors under the Supreme Court's *Halleck* decision. Mr. Wardlaw failed to do so. We dismiss his amended Complaint with prejudice because he chose not to correct the deficiencies of his original complaint and further amendment is futile.[38]

---

[1] *Exavier Wardlaw v. City of Philadelphia,* No. 18-1128, ECF Doc. Nos. 8, 9; *Exavier Wardlaw v. I.G.A. International Market, et al.,* No. 21-1547, ECF Doc. No. 5.

[2] We dismissed Mr. Wardlaw's Complaint against the City of Philadelphia and PhillyCAM and its Board of Directors asserting a deprivation of his First Amendment rights under 42 U.S.C. § 1983 and a disparate treatment claim based on racial and political discrimination in violation of an unspecified section of the Civil Rights Act of 1964. ECF Doc. Nos. 22, 23. We explained Mr. Wardlaw failed to state a claim under 42 U.S.C. § 1983 for the deprivation of his First Amendment rights because (1) he failed to allege the City's involvement in the challenged conduct; and (2) he failed to allege PhillyCAM and its Board are state actors required to maintain an action for the deprivation of his civil rights. With respect to his claims against the City, we explained he failed to plead facts involving the City in the alleged wrongful conduct. With respect to PhillyCAM and its Board, we explained the Supreme Court's 2019 decision in *Manhattan Community Access Corporation v. Halleck*, 139 S. Ct. 1921 (2019), held a private entity operating a public access channel on cable television is not a state actor for purposes of section 1983 liability. We also explained we could not address the viability of his claims of racially and politically motivated disparate treatment based solely on a general reference to the Act with no facts to support his claims. We granted the City's and PhillyCAM's motions to dismiss without prejudice to Mr. Wardlaw to amend his complaint.

---

[3] ECF Doc. No. 30 at 1–5. Mr. Wardlaw submitted two documents we construe as his amended complaint at ECF Doc. Nos. 26 and 30.

[4] ECF Doc. No. 26 at 2.

[5] *Id.*

[6] *Id.*

[7] *Id.* at 3. Mr. Wardlaw first alleged he submitted his film "Underground in Alphabet City" about the Lower East Side neighborhood in New York City to PhillyCAM for broadcast at some unspecified time. *See* ECF Doc. No. 1. PhillyCAM rejected the film allegedly because it "was not made in Phila[delphia] or by a Philadelphian" but nevertheless aired another film by a different producer about the Lower East Side. Mr. Wardlaw attributed PhillyCAM's refusal to air his film on political and racial motives, treating him differently from other producers. Mr. Wardlaw's amended Complaint does not challenge PhillyCAM's refusal to air "Underground in Alphabet City" and now focuses on his December 2020 request to air "Only the Ball was White" as a deprivation of his First Amendment right to free speech.

[8] ECF Doc. No. 30 at 6.

[9] *Id.*

[10] *Id.* We are unclear on Mr. Wardlaw's meaning here. PhillyCAM and its Board construe the word "leeches" as to possibly mean the doctrine of "laches" in the context of copyright law. *See* ECF Doc. No. 32 at 3, n.4. "Laches is 'a defense developed by courts of equity' to protect defendants against 'unreasonable, prejudicial delay in commencing suit.'" *SCA Hygiene Prod. Aktiebolog v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 960 (2017) (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667 (2014)).

[11] ECF Doc. No. 26 at 2.

[12] ECF Doc. No. 30 at 6.

[13] *Id.* at 5.

[14] *Id.* at 6. Mr. Wardlaw attaches several documents, some incomplete, purporting to be the franchise agreements between the City of Philadelphia and cable companies in the mid-1980s. *See Id.* at 7–26 (using the pagination assigned by the CM/ECF docketing system).

[15] *Id.* at 6.

[16] ECF Doc. No. 26 at 3.

[17] *Id.*

[18] *Id.*

[19] *Id.* at 4.

[20] ECF Doc. Nos. 26, 30.

[21] PhillyCAM argues we must dismiss with prejudice his discrimination claims. ECF Doc. No. 32 at 3. It cites Mr. Wardlaw's argument PhillyCAM declined to air his films because of copyright concerns. PhillyCAM argues this shows its decision not to air his films is based on a legitimate, non-discriminatory reason – copyright concerns – versus a discriminatory reason in violation of the Civil Rights Act. We need not reach this argument as we find Mr. Wardlaw's amended Complaint abandoned claims under an unspecified section of the Civil Rights Act of 1964.

[22] ECF Doc. Nos. 28, 39, 32.

[23] Mr. Wardlaw filed two amendments at ECF Doc. Nos. 26 and 30. The second filing at ECF Doc. No. 30 did not appear on the docket until after Defendants moved to dismiss. We allowed Defendants leave to file supplemental memorandum and granted Mr. Wardlaw leave to respond to the motions to dismiss by April 25, 2022. *See* ECF Doc. No. 31. Mr. Wardlaw chose not to respond to the pending motions.

[24] *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011). Under 42 U.S.C. § 1983, a state actor may be liable for "the deprivation of any rights, privileges, or immunities secured by the Constitution . . .." The constitutional deprivation must be made by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

[25] A complaint must state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) is to test the sufficiency of the factual allegations in a complaint. *Sanders v. United States*, 790 F. App'x 424, 426 (3d Cir. 2019). If a plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face," the court should dismiss the complaint. *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kajla v. U.S. Bank Nat'l Ass'n as Tr. for Credit Suisse First Boston MBS ARMT 2005-8*, 806 F. App'x 101, 104 n.5 (3d Cir. 2020) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer and Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While "[t]he plausibility standard is not akin to a 'probability requirement,'" it does require the pleading show "more than a sheer possibility … a defendant has acted unlawfully." *Riboldi v. Warren Cnty. Dep't of Human Servs. Div. of Temp. Assistance & Soc. Servs.*, 781 F. App'x 44, 46 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678). "A pleading that merely 'tenders naked assertion[s] devoid of further factual enhancement' is insufficient." *Id.* (quoting *Iqbal*, 556 U.S. at 668).

In determining whether to grant a Rule 12(b)(6) motion, "we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff" but "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Robert*

---

*W. Mauthe, M.D., P.C. v. Spreemo, Inc.*, 806 F. App'x 151, 152 (3d Cir. 2020) (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878–79 (3d Cir. 2018)). Our Court of Appeals requires us to apply a three-step analysis to a 12(b)(6) motion: (1) we "'tak[e] note of the elements a plaintiff must plead to state a claim'"; (2) we "identify allegations that … 'are not entitled to the assumption of truth' because those allegations 'are no more than conclusion[s]'"; and, (3) "'[w]hen there are well-pleaded factual allegations,' we 'assume their veracity' … in addition to assuming the veracity of 'all reasonable inferences that can be drawn from' those allegations … and, construing the allegations and reasonable inferences 'in the light most favorable to the [plaintiff]'…, we determine whether they 'plausibly give rise to an entitlement to relief.'" *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (internal citations omitted); *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).

[26] ECF Doc. No. 28. The City joins the PhillyCAM Defendants' briefing in support of their motion to dismiss.

[27] ECF Doc. No. 30 at 19–21; 23–26; and 15–18 (using the pagination assigned by the CM/ECF docketing system).

[28] "CATV" is an acronym for "community antenna television." By way of background, the Federal Communications Commission explains: "The Supreme Court affirmed the Commission's jurisdiction over cable in *United States v. Southwestern Cable Co*., 392 U.S. 157 (1968). The Court ruled that 'the Commission has reasonably concluded that regulatory authority over CATV is imperative if it is to perform with appropriate effectiveness certain of its responsibilities.' The Court found the Commission needed authority over cable systems to assure the preservation of local broadcast service and to effect an equitable distribution of broadcast services among the various regions of the country." *See* https://www.fcc.gov/media/engineering/cable-television (last visited April 22, 2022).

[29] ECF Doc. No. 30 at 7–8; 12–14; 10–11.

[30] ECF Doc. No. 30 at 9. According to the Federal Communications Commission, "[i]n October 1984, … Congress amended the Communications Act of 1934 by adopting the Cable Communications Policy Act of 1984. The 1984 Cable Act established policies in the areas of ownership, channel usage, franchise provisions and renewals, subscriber rates and privacy, obscenity and lockboxes, unauthorized reception of services, equal employment opportunity, and pole attachments. The new law also defined jurisdictional boundaries among federal, state and local authorities for regulating cable television systems."
*See* https://www.fcc.gov/media/engineering/cable-television (last visited April 22, 2022).

[31] ECF Doc. No. 22.

[32] ECF Doc. No. 23.

[33] To the extent Mr. Wardlaw now seeks to assert a breach of contract claim based on his allegation PhillyCAM is in breach of the City's franchise agreements with cable providers, it fails as a matter of law. Neither PhillyCAM nor its Board members are parties to the franchise agreements. PhillyCAM and its Board cannot be liable for breach of a contract they are not a party to: "[i]t is

fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract." *QVC, Inc. v. Resultyly, LLC*, 159 F. Supp. 3d 576, 583–84 (E.D. Pa. 2016) (quoting *Electron Energy Corp. v. Short,* 597 A.2d 175, 177 (Pa. Super. Ct. 1991)).

[34] ECF Doc. No. 26 at 4.

[35] 28 U.S.C. § 455(a).

[36] *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 329 (3d Cir. 2015) (first quoting *United States v. Kennedy*, 682 F.3d 244, 258 (3d Cir. 2012), and then quoting *United States v. Bergrin*, 682 F.3d 261, 282 (3d Cir. 2012)).

[37] *Securacomm Consulting, Inc. v. Securacomm, Inc.*, 224 F.3d 273, 278 (3d Cir. 2000) (citations omitted).

[38] *Jones v. Unknown D.O.C. Bus Driver and Transp. Crew*, 944 F.3d 478, 483 (3d Cir. 2019).